CARE AND PROTECTION OF CHARLES & others.

Norfolk.   November 6, 1986. — March 2, 1987.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*School and School Committee,* Care and protection of minor. *Education. Due Process of Law,* Vagueness of statute. *Constitutional Law,* Delegation of powers. *Parent and Child,* Care and protection of minor, Education.

The school committee of a town was a proper party to maintain a proceeding under G. L. c. 119, § 24, seeking a determination that certain school-age children, whose parents wished to instruct them at home, were in need of care and protection "with respect to their educational care only." [328-329]

School attendance requirements contained in G. L. c. 76, § 1, were a proper basis on which a judge, in a proceeding under G. L. c. 119, § 24, could determine that certain school-age children were in need of care and protection "with respect to their educational care only." [329-330]

A school committee's process of approval under G. L. c. 76, § 1, of a plan under which parents proposed to instruct their children at home in fulfilment of school attendance requirements was to be governed by the same body of substantive law as is the approval of private schools and, as so interpreted, c. 76, § 1, is not constitutionally infirm as applied to such parents, either on the ground of vagueness or on the ground that it impermissibly delegates legislative authority. [330-333]

Although acknowledging that the parents of school-age children possess a basic constitutional right in directing their children's education, this court concluded that, with respect to parents who wished to instruct their children at home, the school committee of the town in which they resided could properly protect the State's legitimate educational interests by enforcing, through the approval process under G. L. c. 76, § 1, certain reasonable educational requirements similar to those applied to public and private schools. [333-336]

Statement of guidelines as to the extent to which a program for the home instruction of school-age children may be conditioned on the fulfilment of certain requirements, without infringing the liberty interests of the parents under the Fourteenth Amendment to the United States Constitution. [337-340]

PETITION filed in the Stoughton Division of the District Court Department on October 16, 1985.

The case was heard by *Robert B. Sheiber, J.*

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Paul O. Dillon* for the parents.

*Robert G. Woernle, Jr.,* for the minors.

*Edward F. Lenox, Jr.,* for the School Committee of Canton.

*Austin Broadhurst, Wendell Robert Carr, & Laura M. Teopaco,* for Massachusetts Association of School Committees, Inc., amicus curiae, submitted a brief.

HENNESSEY, C.J. This case concerns the education of children at home by their parents. We are especially concerned here with the applicable constitutional law, as well as certain provisions of G. L. c. 119 (care and protection of children), G. L. c. 71 (public schools), and G. L. c. 76 (attendance at school). Due to religious convictions, the parents desired to educate their three children, ages eleven, eight, and six, at home during the 1985-1986 school year.[1] Although the parents instructed their children in their "home school," the school committee of Canton, on October 15, 1985, initiated truancy proceedings in Stoughton District Court, asserting a violation of G. L. c. 76, § 2. On October 16, 1985, a petition for care and protection of the children under G. L. c. 119, § 24, was filed by an attorney for the town, alleging that the three children were "without necessary and proper educational care and discipline" and that their parents were "unwilling and unable or unavailable to provide such care." At a hearing on October 25, the criminal complaints under G. L. c. 76, § 2, were dismissed, and a hearing on the care and protection issue was subsequently scheduled for and held on December 6, 1985. On May 13, 1986, the judge issued his "findings and order," which determined that the children were in need of care and protection within the meaning of G. L. c. 119 with respect to

[1] Two of the children attended Canton's Kennedy Elementary School during the 1984-1985 school year; however, none of the three children named in this petition attended public school during the 1985-1986 school year. The name assigned to this case is fictitious.

their educational care only and ordered that the children "commence public or approved school attendance forthwith," although the children were allowed to remain in the physical and legal custody of their parents. The parents appealed this order to the Appeals Court. The judge stayed his order pending appeal. We transferred the case to this court on our own motion.

This case presents us with the question of accommodating the parents' rights under the Constitution of the United States and the Massachusetts Constitution with the governmental interest in the education of its citizens. For reasons which appear in the conclusion to this opinion, we direct that the judge's order be vacated and that the case be remanded to the lower court for further proceedings.

We summarize the relevant facts from the judge's "findings and order," and the judge's "settled report" prepared in accordance with Rule 3 (c) of the Supplemental Rules of Appellate Procedure in Care and Protection Cases. On August 21, 1985, the children's mother telephoned Dr. James C. Lynch, assistant superintendent of the Canton public schools, informing him that she and her husband intended to educate their three children at home during the 1985-1986 school year. This telephone call was followed by a letter dated September 1, 1985, which stated that: "[a]s christian parents, we are committed to introducing our children to and nurturing them in the truths of the Bible. . . . Our decision to home-school is based on the conviction that what [our children] need most is exposure to us, their parents, and a family whose foundation is the Word of God."

A meeting was held on September 4 with the parents and Drs. Lynch and Peter S. Capernaros, the superintendent of the Canton schools. At this meeting, the parents explained that they would be using a curriculum, which had yet to arrive, that was customary in "Christian Schools." In addition, they stated that the children would be involved in community activities such as gymnastics and soccer. Doctors Lynch and Capernaros determined that, although neither parent was certified to teach or had a college degree, each parent had a high

school education[2] and the children's father had taken courses at the college level.

The parents attended the evening meeting of the Canton school committee on September 19 and were permitted to present their proposal in an executive session. The parents emphasized the superiority of their proposed "tutorial system" compared to the education received in public school classrooms. They stated that, although the curriculum materials still had not arrived, the curriculum would be individualized to meet each child's needs. Furthermore, they stated that they would be their children's only instructors and that the children's mother would be the primary instructor. School committee members expressed their concern about certain aspects of the parents' proposal, including the parents' objection to school department's testing and evaluation of their children's progress. The committee chairman informed the parents that the committee hoped to make a decision at the regularly scheduled October 3 meeting and that in the meantime the parents should prepare a more complete and detailed proposal.

On October 2, the children's father met with Drs. Lynch and Capernaros. At this meeting, he refused, for fear of prejudice, to document his educational background and that of his wife. He also stated his unwillingness to provide the administration with the number of hours and days that would be devoted to instruction of his children and his opposition to visits by school department personnel to his home for observation of the program. He did indicate his willingness to provide the administration with copies of the table of contents of the curriculum materials when they arrived and his preference for using a particular standardized test, which he asserted had been accepted by the Department of Education, for the evaluation of the children's progress.

Although invited, the parents declined to attend the October 3 meeting of the school committee, stating that they had no

---

[2] At a subsequent school committee meeting held on September 19, the children's mother admitted that she had not graduated from high school but had only completed the eleventh grade. She subsequently obtained her high school equivalency certificate while this case was pending.

additional information for the committee. The committee instructed the school superintendent to send the parents a letter informing them that their consent to the stipulations of a proposed memorandum of agreement would facilitate the committee's consideration of their proposal. On October 16, the parents returned an edited version of the agreement, unsigned, indicating the stipulations that they found unacceptable.

At the November 14 meeting of the school committee, to which the parents were invited but again declined to attend,[3] the members voted to accept the recommendation of the school superintendent to deny the parents permission to educate their children at home. The parents were informed of this vote by letter dated November 19. The letter included a memorandum which outlined the following three major objections to the parents' proposal. First, the superintendent had not been given reason to believe that the parents were competent to teach their children. Second, the parents had indicated that the children would spend less time on formal instruction than would children in public schools. Third, the parents objected to the school's efforts to monitor or observe the instructional methods used in the home school and periodically to test the children to determine whether they were making reasonable progress in their education. The superintendent indicated that, in his judgment, allowing the parents to educate their children "would be denying those children a proper education, by any reasonable standards."

1. *School Committee Is Proper Party.*

The parents first contend that the school committee of Canton is not a proper party in this appeal and, thus, the case should be summarily dismissed for "lack of prosecution." We disagree. General Laws c. 119, § 24 (1984 ed.), provides that *"any person* alleging on behalf of a child under the age of eighteen years . . . that said child is without: (a) necessary and proper physical or educational care and discipline . . . may issue a precept to bring such child before . . . [a] court . . ." (em-

---

[3] The parents were represented at the meeting by counsel who addressed the committee.

phasis added). See *Custody of a Minor (No. 1)*, 385 Mass. 697, 705-706 (1982). Consequently, the petition for care and protection was properly filed by an attorney acting for the town. Nevertheless, the parents argue that the school committee had no authority to proceed as a party in the case.[4] They can point to no statutory provision, however, which would preclude the school committee from the role that it has taken in this case. Although they cite G. L. c. 119, § 27, which limits those parties who may appeal the adjudication of a prior care and protection order, it has no specific application in this instance. On the contrary, G. L. c. 76, § 1 (1984 ed.), states that "[t]he school committee of each town shall provide for and enforce the school attendance of all children actually residing therein in accordance herewith." Since an appropriate avenue of enforcement of G. L. c. 76, § 1, is a petition to find the children in need of care and protection with respect to their educational care under G. L. c. 119, § 24, we conclude that the school committee of Canton was a proper party in this case.

2. *General Laws c. 76, § 1: Its Relationship to Care and Protection (G. L. c. 119) and Its Constitutionality.*

We next address the contentions of the parents with respect to G. L. c. 76, § 1, the violation of which formed the basis for the judge's determination that the children were in need of care and protection "with respect to their educational care only."[5]

The parents first argue that G. L. c. 76, § 1, is inapplicable to proceedings under G. L. c. 119, §§ 1-39. Again, we disagree. General Laws c. 76, § 1, provides the standards by which the judge is to determine whether a child is "without . . . necessary and proper . . . educational care and discipline" and whether the "parents . . . are unwilling . . . or unavailable to provide any such care, discipline or attention . . . ." G. L. c. 119, § 24. Without such an implied reference under G. L. c. 119, § 24, to G. L. c. 76, § 1, the judge would

---

[4] The Department of Social Services was never made a party to the proceedings.

[5] We acknowledge the helpful analysis provided by the Massachusetts Association of School Committees, Inc., as amicus curiae.

be without guidance in determining what constitutes "necessary and proper . . . educational care and discipline."

The parents next argue that G. L. c. 76, § 1, is constitutionally deficient due to vagueness because it fails to provide any standards for the approval of a home school proposal or to provide a procedure through which this determination is to be made.[6] The parents couple this argument with a claim that G. L. c. 76, § 1, is an unlawful delegation of legislative power to the superintendent and school committee. We have stated that the "constitutional claims of 'void for vagueness' and unlawful delegation of legislative authority are closely related. The principal question posed by both claims is whether the statute is so vague 'that men of common intelligence must necessarily guess at its meaning and differ as to its application.' *Commonwealth* v. *Carpenter,* 325 Mass. 519, 521 [1950]. *O'Connell* v. *Brockton Bd. of Appeals,* 344 Mass. 208, 212 [1962]." *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 363 (1973). *Warren* v. *Hazardous Waste Facility Site Safety Council,* 392 Mass. 107, 123-124 (1984). See *Zwickler* v. *Koota,* 389 U.S. 241, 249 (1967); *Connally* v. *General Constr. Co.,* 269 U.S. 385, 391 (1926). Under this standard, we conclude that G. L. c. 76, § 1, is neither void for vagueness nor an unlawful delegation of legislative authority.

In *Warren* v. *Hazardous Waste Facility Site Safety Council, supra,* we determined that "[a] detailed specification of standards is not required" in order that a statute withstand our scrutiny against such a claim. *Id.* at 124. Indeed, we concluded that standards not expressly provided for may be found in the statute's necessary implications. "The purpose, to a substantial degree, sets the standards." *Id.* The purpose of G. L. c. 76, § 1, is to ensure that "all the children shall be educated." *Commonwealth* v. *Roberts,* 159 Mass. 372, 374 (1893) (interpreting a predecessor statute). In order to effectuate this pur-

---

[6] We note the parents' additional contention that they need not obtain the school committee's approval of their home school proposal. Thus, their arguments concerning standards to be used in the approval process anticipate a ruling that school committee approval is required.

pose, the Legislature has provided a comprehensive statutory scheme setting the standards for the education of the State's youth. This statutory scheme includes standards under G. L. c. 71, §§ 1, 2, and 3, concerning the subjects that must be taught in public schools and the requirements for teacher qualification.[7] Furthermore, G. L. c. 76, § 1 (1984 ed.), specifically provides that: "For the purposes of this section, school committees shall approve a private school when satisfied that the instruction in all the studies required by law equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town; but shall not withhold such approval on account of religious teaching . . . ." Our reading of this statute indicates that the Legislature intended that the approval of a home school proposal fall within the above enunciated standard for the approval of a private school. Consequently, the body of substantive law referred to above provides the superintendents and school committees of the Commonwealth with sufficient standards such that G. L. c. 76, § 1, can withstand a challenge of vagueness and unlawful delegation of legislative authority. See *Braintree Baptist Temple* v. *Holbrook Pub. Schools,* 616 F. Supp. 81, 91 (D. Mass. 1984).

General Laws c. 76, § 1, also does not fail under the Federal standard of vagueness articulated in *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498-499 (1982).

[7] General Laws c. 71, § 1 (1984 ed.), provides in relevant part: "Such schools shall be taught by teachers of competent ability and good morals, and shall give instruction and training in orthography, reading, writing, the English language and grammar, geography, arithmetic, drawing, music, the history and constitution of the United States, the duties of citizenship, health education, physical education and good behavior."

General Laws c. 71, § 2 (1984 ed.), provides that: "In all public elementary and high schools American history and civics, including the constitution of the United States, the declaration of independence and the bill of rights, and in all public schools the constitution of the Commonwealth and local history and government, shall be taught as required subjects for the purpose of promoting civic service and a greater knowledge thereof, and of fitting the pupils, morally and intellectually, for the duties of citizenship."

General Laws c. 71, § 3 (1984 ed.), provides, in relevant part, that: "Physical education shall be taught as a required subject in all grades for all students in the public schools for the purpose of promoting the physical well-being of such students."

As stated in that case, "[a] vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Id.* at 498, quoting *Grayned* v. *Rockford,* 408 U.S. 104, 108-109 (1972). Such is not the situation here since the school committee must implement the standards set out in the statutes described above. Furthermore, the Supreme Court indicated that the most important factor in this determination is whether the law "threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 499. General Laws c. 76, § 1, specifically forbids the school committee from withholding approval of private schools "on account of religious teaching." Because we conclude that this legislative policy extends to home school proposals, no constitutionally protected right is implicated.

With regard to the claim that G. L. c. 76, § 1, constitutes an unlawful delegation of legislative authority, we also note that "[t]he Legislature may delegate to a board or officer the working out of the details of a policy adopted by the Legislature." *Warren* v. *Hazardous Waste Facility Site Safety Council, supra* at 124, quoting *Massachusetts Bay Transp. Auth.* v. *Boston Safe Deposit & Trust Co.,* 348 Mass. 538, 544 (1965). Since Colonial times, education in Massachusetts has been "under the control of the people in each municipality." *Jenkins* v. *Andover,* 103 Mass. 94, 97 (1869). Indeed the power of the school committees, although broad, has been upheld in numerous cases. "The school committee may make all reasonable rules and regulations for the government, discipline and management of the schools under their charge. This includes a determination within the bounds set by the statutes of the subjects to be taught and the nature of the schools to be maintained and the exercise of discrimination, insight and wisdom in the election of teachers and in the general supervision of the school system, with all the incidental powers essential to the discharge of their main functions." *Leonard* v. *School Comm. of Springfield,* 241 Mass. 325, 330 (1922). Although school committees do exercise broad discretion in the performance of their duties, it is not unbridled. Again, the substan-

tial body of statutory law described above sets bounds under which the committees must act. Consequently, G. L. c. 76, § 1, does not fail as an unlawful delegation of legislative authority.

We have no doubt that the statute is constitutional. If there were any lingering doubt on this issue, it would be resolved by recognition of the guidelines which we have set out in part 4 of this opinion for the assistance of parents and school authorities. These guidelines, like the specific provisions of the statutory scheme, provide particulars through which the reasonableness of parents and public authorities may be measured.

3. *Right to Home Education; Limitations of the Right.*

We now examine the parents' contention that the approval process of G. L. c. 76, § 1, infringes on their right to educate their own children, a right protected by the Fourteenth Amendment to the United States Constitution. General Laws c. 76, § 1, requires that "[e]very child between the minimum and maximum ages established for school attendance by the board of education . . . attend a public day school in [the] town [where the child resides] or some other day school approved by the school committee . . . but such attendance shall not be required . . . of a child who is being otherwise instructed in a manner approved in advance by the superintendent or the school committee." The Canton school committee does not dispute the parents' right to educate their children at home. *Commonwealth* v. *Roberts, supra* at 374 (allowing instruction by the parents provided "it is given in good faith and is sufficient in extent"). However, the school committee does require that the parents submit to them a home schooling proposal, outlining, among other things, the curriculum, materials to be used, and qualifications of the instructors, for its approval as required under G. L. c. 76, § 1. The parents argue that such approval infringes on their rights under the Fourteenth Amendment to control the upbringing and education of their children.[8]

---

[8] We recognize that the parents also present arguments based on the First Amendment to the United States Constitution and art. 2 and amended art. 18 of the Declaration of Rights of the Massachusetts Constitution. Because

The United States Supreme Court has made it clear that the liberty interests protected by the Fourteenth Amendment extend to activities involving child rearing and education. *Pierce* v. *Society of Sisters,* 268 U.S. 510, 535 (1925). *Meyer* v. *Nebraska,* 262 U.S. 390, 399 (1923). See *Farrington* v. *Tokushige,* 273 U.S. 284, 298-299 (1927) (recognizing a similar right under the Fifth Amendment). "The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce* v. *Society of Sisters, supra.* See *School Dist. of Abington* v. *Schempp,* 374 U.S. 203, 242 (1963) (Brennan, J., concurring); *Richards* v. *Forrest,* 278 Mass. 547, 553 (1932). The "additional obligations" referred to by the Court have been defined to include "the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Wisconsin* v. *Yoder,* 406 U.S. 205, 233 (1972). Furthermore, the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Id.* at 232.

While the parents contend, and we agree, that they possess a basic right in directing the education of their children, such a right is not absolute but must be reconciled with the substantial State interest in the education of its citizenry. The United States Supreme Court has recognized the State's "high responsibility for education of its citizens." *Wisconsin* v. *Yoder, supra* at

---

we conclude that the parents have a basic right under the Fourteenth Amendment in directing the educational upbringing of their children subject to reasonable government regulation, we need not address these arguments. We note, however, that under the facts of this case, the free exercise of religion claims under neither the United States nor the Massachusetts Constitution would entitle the parents to any greater protection than we grant them in this opinion. See *Runyon* v. *McCrary,* 427 U.S. 160, 178 n.15 (1976); *Duro* v. *District Attorney, Second Judicial Dist. of N.C.,* 712 F.2d 96, 98 (4th Cir. 1983), cert. denied, 465 U.S. 1006 (1984).

213.[9] "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown* v. *Board of Educ.,* 347 U.S. 483, 493 (1954). *Attorney Gen.* v. *Bailey,* 386 Mass. 367, 377, cert. denied, 459 U.S. 970 (1982). The Massachusetts Constitution itself proclaims the State's interest in ensuring that its citizens are educated. "Wisdom, and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of Legislatures and Magistrates, in all future periods of this Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially . . . public schools and grammar schools in the towns; . . . ." Part II, c. 5, § 2, of the Massachusetts Constitution. We have made clear that, from the beginning of its history, the Commonwealth has emphasized the crucial importance in the education of children. *Jenkins* v. *Andover,* 103 Mass. 94, 96-97 (1869). However, like the parents' basic right in directing the education of their children, "the State's interest in universal compulsory education . . . is by no means absolute to the exclusion or subordination of all other interests." *Wisconsin* v. *Yoder, supra* at 215.

---

[9] The Supreme Court has recognized two State interests in a system of compulsory education. "[S]ome degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. Further, education prepares individuals to be self-reliant and self-sufficient participants in society." *Wisconsin* v. *Yoder, supra* at 221.

The parents contend that, if the State has a substantial interest in this regard, the interest must be carefully defined as to its true nature. They argue that the extent of the State's interest is not in educating the children but only in knowing that the children are being educated. In the past we have had occasion to consider the State's interest under its compulsory education laws. In *Commonwealth* v. *Roberts, supra* at 374, we examined the predecessor statute to G. L. c. 76, § 1, and stated that "[t]he great object of these provisions of the statutes has been that all children shall be educated, not that they shall be educated in any particular way." Consequently, we agree with the parents that the State interest in this regard lies in ensuring that the children residing within the State receive an education, not that the educational process be dictated in its minutest detail. See *Appeal of Peirce,* 122 N.H. 762, 768 (1982) (Douglas and Brock, JJ., concurring specially) ("[W]hile the State may adopt a policy requiring that children be educated, it does not have the unlimited power to require that they be educated in a certain way at a certain place"). However, in order to ensure that "all the children shall be educated," we conclude that the approval process required under G. L. c. 76, § 1, is necessary to promote effectively the State's substantial interest. *State* v. *McDonough,* 468 A.2d 977, 980 (Me. 1983). Without such an approval process, the State would be powerless to assert its interest in the case of a child "who is being otherwise instructed." "There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education." *Wisconsin* v. *Yoder, supra* at 213. Thus, the school committee may enforce, through the approval process under G. L. c. 76, § 1, certain reasonable educational requirements similar to those required for public and private schools.[10]

---

[10] In *Pierce* v. *Society of Sisters, supra* at 534, the Supreme Court stated: "No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that

4. *Guidelines for Approval of Home Education Plan.*

Having concluded that the approval process under G. L. c. 76, § 1, is constitutionally permissible, we caution the superintendent or school committee that the approval of a home school proposal must not be conditioned on requirements that are not essential to the State interest in ensuring that "all the children shall be educated." We recognize "that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." *Wisconsin* v. *Yoder, supra* at 235. However, because we remand this case to the lower court, we offer some guidance on the extent to which approval of a home school proposal may be conditioned on certain requirements without infringing on the liberty interests of the parents under the Fourteenth Amendment.

We begin by reiterating our holding in *Commonwealth* v. *Renfrew,* 332 Mass. 492, 494 (1955), that "[h]ome education of their child by the defendants without the prior approval of the superintendent or the [school] committee [does] not show a compliance with the statute and bar the prosecution of the complaints." Thus, as the statute indicates, approval must be obtained *in advance,* i.e., prior to the removal of the children from the public school and to the commencement of the home schooling program. See *State* v. *Riddle,* 168 W. Va. 429, 438 (1981). Procedurally, the superintendent or school committee must provide the parents with an opportunity to explain their proposed plan and present witnesses on their behalf. A hearing during a school committee meeting would be sufficient to meet this requirement. In obtaining the superintendent's or the school committee's approval, the parents bear the responsibility of demonstrating that the home school proposal meets the requirements of G. L. c. 76, § 1, in that the instruction will equal "in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town . . . ." See *Matter of Kilroy,* 121 Misc. 2d 98, 101

nothing be taught which is manifestly inimical to the public welfare." See *Meyer* v. *Nebraska, supra* at 402; *Runyon* v. *McCrary,* 427 U.S. 160, 178 (1976).

(N.Y. Fam. Ct. 1983). If the home school proposal is rejected, the superintendent or the school committee must detail the reasons for the decision. The parents must then be given an opportunity to revise their proposal to remedy its inadequacies. However, if the parents commence the education of their children at home in the face of the school committee's refusal to approve the parents' home school proposal, the burden of proof under G. L. c. 119 or G. L. c. 76, § 2, shifts to the school committee to show that the instruction outlined in the home school proposal fails to equal "in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town . . . ." G. L. c. 76, § 1. See *In re Monnig,* 638 S.W.2d 782, 788 (Mo. Ct. App. 1982).

The school committee of Canton presented the parents with a memorandum of agreement outlining certain requirements necessary for the parents to obtain approval for their proposal. Although we decline to address the specifics of each requirement, we recognize that certain factors may be considered by the superintendent or school committee in determining whether or not to approve a home school proposal. Primary among these is the proposed curriculum and the number of hours of instruction in each of the proposed subjects. The Supreme Court has acknowledged that *Pierce* v. *Society of Sisters, supra,* upon which the parents rely, lends "no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society." *Runyon* v. *McCrary,* 427 U.S. 160, 177 (1976), quoting *Wisconsin* v. *Yoder, supra* at 239 (White, J., concurring). General Laws c. 71, §§ 1, 2, and 3, list the subjects that must be taught in schools maintained by the towns throughout the Commonwealth. Specifically, § 1 requires "instruction and training in orthography, reading, writing, the English language and grammar, geography, arithmetic, drawing, music, the history and constitution of the United States, the duties of citizenship, health education, physical education and good behavior." Under § 1, the school committee may also require other subjects

considered "expedient." Furthermore, G. L. c. 71, §§ 1 and 4, and 603 Code Mass. Regs. § 27.01 (1980) require cities and towns to operate the public schools for a minimum of 180 days. The superintendent or school committee may properly consider the length of the proposed home school year and the hours of instruction in each subject. As we have stated before, "[t]he quality of education can be rendered meaningless if the quantity is subject to manipulation." *Board of Educ.* v. *Boston,* 386 Mass. 103, 108 (1982), quoting *School Comm. of Burlington* v. *Burlington Educators Ass'n,* 7 Mass. App. Ct. 41, 46 (1979).

The superintendent or school committee may also examine the competency of the parents to teach the children. General Laws c. 71, § 1, provides that teachers shall be "of competent ability and good morals." While we recognize that teachers in public schools must be certified, certification would not appropriately be required for parents under a home school proposal. See *State* v. *Riddle, supra* at 366 (under a statutory requirement of "persons qualified to give instruction"). But see *Hanson* v. *Cushman,* 490 F. Supp. 109, 112 (W.D. Mich. 1980); *Jernigan* v. *State,* 412 So. 2d 1242, 1245 (Ala. Crim. App. 1982); *Grigg* v. *Commonwealth,* 224 Va. 356, 363-364 (1982). Nor must the parents have college or advanced academic degrees. However, the superintendent or school committee may properly inquire as to the academic credentials or other qualifications of the parent or parents who will be instructing the children.

The superintendent or school committee must also have access to the textbooks, workbooks, and other instructional aids to be used by the children and to the lesson plans and teaching manuals to be used by the parents. This access is necessary only to determine the type of subjects to be taught and the grade level of the instruction for comparison purposes with the curriculum of the public schools. The superintendent or school committee may not use this access to dictate the manner in which the subjects will be taught. This would involve the school authorities in an activity beyond the legitimate scope of the State interest involved.

Finally, the superintendent or school committee may properly require periodic standardized testing of the children to

ensure educational progress and the attainment of minimum standards. See *Johnson* v. *Charles City Community Schools Bd. of Educ.,* 368 N.W.2d 74, 79 (Iowa), cert. denied sub nom. *Pruessner* v. *Benton,* 474 U.S. 1033 (1985) (requiring testing in addition to other minimum standards in a private school setting). *State* v. *Rivinius,* 328 N.W.2d 220, 229 (N.D. 1982), cert. denied, 460 U.S. 1070 (1983) (same). In consultation with the parents, the school authorities may decide where the testing is to occur and the type of testing instrument to be used. Where practical, a neutral party should administer the test. Other means of evaluating the progress of the children may be substituted for the formal testing process, such as periodic progress reports or dated work samples, subject to the approval of the parents. With appropriate testing procedures or progress reports, there may be no need for periodic on-site visits or observations of the learning environment by school authority personnel. But see *Matter of Kilroy, supra* at 102 (upholding requirement of on-site visits).

5. *Conclusion.*

The judge properly relied on G. L. c. 76, § 1, in determining that the children were, under G. L. c. 119, in need of care and protection with respect to their educational care. We think, also, that the judge's order finding the children in need of care and protection was warranted on the evidence. (For example, the judge found on the evidence that the parents had failed to provide documentation as to their educational qualifications and had refused to permit testing of the children.) Nevertheless, it is apparent that the parties have never confronted the issues before them in light of the legal principles and guidelines set out in this opinion. We conclude that the interests of all will be best served by the following order: the judge's order (presently stayed pending appeal) is vacated; the parties are to proceed expeditiously in a serious effort to resolve the matter by agreement; the case is remanded to the lower court where the trial judge is to have continuing jurisdiction over the case for such further proceedings as he deems necessary.

*So ordered.*