Connors, Thomas A., J.
Sophie Currier (“Currier”) brought this action against the defendant, the National Board of Medical Examiners (the “NBME”), seeking declaratory and injunctive relief and an award of attorneys fees and costs. Currier alleges that she sought to take a medical examination offered by the NBME at a time when she would be breastfeeding her second child. She further alleges that she requested the NBME to provide her with additional break time and a suitable environment so she could adequately express breast milk during the examination, contending that the standard break time provided by the NBME would be insufficient to both adequately express breast milk and also attend to her general personal needs. She alleges that the NBME’s decision not to grant her these requests violated (1) Articles 1, 10, and 12 of the Massachusetts Declaration of Rights, (2) G.L.c. 12, §§11H-11I, the Massachusetts Civil Rights Act (the “MCRA”), (3) G.L.c. 93, §102, the Massachusetts Equal Rights Act (the “MERA”), and (4) G.L.c. 272, §§92A, 98, the Massachusetts Public Accommodations Law (the “MPAA”). Currier also seeks a declaratory judgment that the NBME must provide her with additional break time to take the examination, and claims entitlement to attorneys fees and costs under G.L.c. 12, §§11H-1II and G.L.c. 93, §102.[2]This case is now before the court on the parties’ Cross-Motions for Summary Judgment. For the following reasons, the plaintiffs motion is DENIED and the defendant’s motion is ALLOWED.
BACKGROUND
The following facts, taken from the summary judgment record, are undisputed unless otherwise noted.
The Massachusetts Board of Registration in Medicine (the “Board”), the Commonwealth’s medical licensing agency, has promulgated regulations intended to set forth “substantive standards governing the practice of medicine which will promote the public health, welfare and safely.” 243 Code Mass. Regs. 2.01(1). These regulations require any individual seeking to obtain a full medical license to (a) have completed a minimum of two or more years at a legally chartered college or university, (b) have completed and attended four academic years of instruction in one or more legally chartered medical schools and received the degree of doctor of medicine, or their equivalents, and (c) submit to the Board satisfactory proof of good moral character, complete one year of post-graduate medical training, and fulfill the examination requirements for licensure as provided in 243 Code Mass. Regs. 2.02(2). 243 Code Mass. Regs. 202(1).
Under 243 Code Mass. Regs. 2.02(2), an individual “may fulfill the examination requirements for licen-sure by submitting evidence of having achieved a score acceptable to the Board on the licensing examinations listed at 243 [Code Mass. Regs.) 2.02(2)(a).” These examinations include the United States Medical Licensing Examination (“USMLE”) Steps 1,2, and 3, the National Board of Medical Examiners’ examination Parts 1,2, and 3, the Federation Licensing Examination (“FLEX”) Parts 1 and 2, and the Licentiate of the Medical Council of Canada (“LMCC”) Parts 1 and 2. Notably, the NBME and the FLEX examinations are no longer administered, replaced by the USMLE three-step examination.
The USMLE is co-sponsored by the NBME, a private non-profit corporation with offices in Philadelphia, Pennsylvania. The NBME articulates its mission as to “protect the health of the public through state of the art assessment of health professionals.” The NBME assesses such individuals by administering the USMLE, an examination which it states is intended to assess a physician’s ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care.
The Step 2 Common Knowledge (the “Step 2 CK” or the “examination”) constitutes one step of the USMLE. The NBME allows only those individuals who are enrolled in or have graduated from medicals schools *415 to take this examination.[3] Such person may take the test, which is administered five to six days per week, fifty weeks per year, at one of approximately 300 testing centers in the United States, which centers are operated by Prometric, a private third-party company. The examination is then graded by the NBME, which has established a minimum passing score, and the scores are then reported to the examinees’ respective medical schools.
The NBME administers the Step 2 CK under timed conditions to ensure the integrity of the examinees’ scores. The examination’s standard format consists of a nine-hour testing session divided as follows: Examinees first have fifteen minutes to complete the introductory tutorial. Examinees then have eight hours to answer 370 multiple choice questions distributed evenly among eight one-hour testing blocks. Examinees also have forty-five minutes of break time that may be used at any time during the examination. In addition, examinees who complete the tutorial or any one of the one-hour testing blocks early may use the remaining time as additional break time. Also under the standard format, examinees take the Step 2 CK in shared examination rooms into which they are not permitted to bring personal items. When using break time, however, examinees may leave the examination rooms and attend to their personal needs.
According to the NBME, it deviates from this standard format only when an examinee has a disability as defined by the Americans with Disabilities Act (“ADA”) and requests accommodations. Under the ADA, an individual is considered to have a “disability" if he or she has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. §12102. Where an examinee has an impairment which the NBME deems to be temporary, it determines on a case-by-case basis whether it nonetheless rises to the level of a disability. In doing so, the NBME contends that it takes into account both the duration of the impairment and the extent to which the disability actually limits a major life activity of the affected examinee. Currier alleges that in making these determinations, the NBME has erroneously provided accommodations to examinees whose impairments did not constitute disabilities under the ADA.
The accommodations offered by the NBME to examinees considered disabled include additional time to complete the examination, additional break time, large print or audio examinations, or assistance in recording answers. The NBME also offers “personal item exceptions” to examinees that it determines have impairments that do not constitute disabilities under the ADA. These exceptions include allowing these examinees to bring food, pillows, and/or other personal items into the examination room. No additional time or other accommodation, however, is given to these examinees on the basis of such an impairment.
On June 12, 2007, Currier, then enrolled at Harvard Medical School, notified the NBME that she planned to take the Step 2 CK at the Prometric testing center in Brookline, Massachusetts, in the fall of2007. She further informed the NBME that she would be breastfeeding her then four- to five-month-old second child at that time, and she requested that the NBME provide her with additional break time during the examination in order to express breast milk. The NBME denied this request, responding that it only provided additional time to examinees with disabilities as defined by the ADA and that lactation and the expression of breast milk are not ADA-recognized disabilities. The parties do not dispute that lactation and breastfeeding do not qualify as disabilities under the ADA.
On June 25, 2007, Currier requested that the NBME provide her with accommodations based on her having the disabilities of dyslexia and attention deficit hyperactivity disorder. On July 11, 2007, the NBME granted this request of Currier’s, providing her with an additional testing day to complete the Step 2 CK and a separate testing room in which to take the examination. On August 16, 2007, in response to Currier’s other request, that which sought additional break time for expressing breast milk, the NBME granted her a private examination room with a power outlet within which she could express breast milk during the examination. It also made for her an exception to the usual rule pertaining to examinee’s use of personal items, permitting Currier to bring food, liquids, and multiple assembled breast pumps into this private room. Currier rejected the NBME’s offer.
On September 5, 2007, Currier filed this action against the NBME. On September 14, 2007, she filed an Amended Complaint, alleging that the standard forty-five minutes of break time provided by the NBME to examinees would be insufficient for her both to attend to her general personal needs and adequately to express breast milk. In her Amended Complaint, Currier contended that she needed an additional one hour of break time on each of her testing days in order adequately to express breast milk twice during the Step 2 CK. She contended that she needs at the most thirty minutes each time to assemble the breast pumps, express the milk, disassemble and wash the pumps, and store the expressed milk. Currier alleged that the NBME’s refusal to provide her this time in which to perform these tasks violated her constitutional and statutory civil rights. Currier further petitioned the court for an injunction requiring the NBME to provide her with one hour of additional break time and a private room having a power outlet on the two days over which the NBME was permitting her to take the Step 2 CK. On September 17, 2007, the Superior Court (Brady, J.) denied Currier’s motion for a prelim *416 inary injunction, and Currier sought interlocutory relief pursuant to G.L.c. 231, §118 (first par.).
On September 26,2007, asinglejustice of the Appeals Court (Katzmann, J.) vacated the Superior Court’s decision, granted Currier’s petition, and issued a preliminary injunction requiring the NBME to provide Currier with the relief requested. On October 1, 2007, a single justice of the Supreme Judicial Court (Botsford, J.) denied the NBME’s petition for relief from this decision. The NBME then appealed the decision of the single justice of the Appeals Court to a three-judge panel of the Appeals Court. On October 5, 2007, this panel affirmed the decision on the basis that the single justice’s decision on the grant of preliminary injunctive relief constituted neither an abuse of discretion nor a clear error of law.
On October 10 and 11, 2007, the NBME administered the Step 2 CK to Currier in a private room with the additional one hour of break time and as ordered. Currier applied to take the Step 2 CK again roughly a year later.[4] On this occasion, Currier once more requested and was granted an additional day to take the examination due to her disabilities, but she did not request any other additional time as she had in October of 2007. On November 28, 2008, Currier received a passing score on the Step 2 CK.
DISCUSSION
I. Standard of Review
Summary judgment is properly granted when there is no genuine issue as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Carey v. New England Organ Bank, 446 Mass. 270, 278 (2006). A fact is material if it would affect the outcome of the case. A dispute of fact is genuine if the evidence would permit a reasonable fact finder to return a judgment for the non-moving party. Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 809 (1991). The moving party bears the initial burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner, 410 Mass. at 809; Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once this is satisfied, the burden shifts to the party opposing summary judgment to respond and allege specific facts establishing the existence of a genuine issue of material fact in order to defeat the motion. Pederson, 404 Mass, at 17. The opposing party cannot rest on its pleadings and mere assertions of disputed facts to defeat the summary judgment motion. LaLonde v. Eissner, 405 Mass 207, 209 (1989).
II. Mootness and Mootness Exceptions
Noting that the grant of past injunctive relief had permitted Currier to take the examination with expanded break periods as she had sought, NBME argues that it is entitled to summary judgment on the entirety of her complaint, contending that the case is now moot.
Before reaching the merits of a case, a court must determine whether that case presents “a live issue for adjudication.” Metros v. Secretary of the Commonwealth, 396 Mass. 156, 159 (1985). As a general rule, a court will decide a case only if it involves actual controversies. Id. Courts are reluctant to hear moot cases because “(a) only factually concrete disputes are capable of resolution through the adversary process, (b) it is feared that the parties will not adequately represent positions in which they no longer have a personal stake, (c) the adjudication of hypothetical disputes would encroach on the legislative domain, and (d) judicial economy requires that insubstantial controversies not be litigated.” Lockhart v. Attorney Gen., 390 Mass. 780, 782-83 (1984), quoting Wolf v. Commissioner of Pub. Welfare, 367 Mass. 293, 298 (1975).
In the present case, Currier argues first that her MCRA and MERA claims present live issues, since she is entitled to attorneys fees if she prevails. The court, however, agrees that NBME has the stronger argument on the propriety of this theory being advanced by Currier as a basis for the continued viability of her lawsuit. Under established case law, an assertion of a potential claim for attorneys fees and costs does not serve by itself to justify deciding an otherwise moot case. Ott v. Boston Edison Co., 413 Mass. 680, 683 (1992).
Currier makes a second and more compelling argument, however, which relates to an exception to the normal rule relating to cases in which the claim of mootness has been raised. In certain circumstances, a court may exercise its discretion to hear moot cases where “(1) the issue was fully argued on both sides; (2) the question was certain, or at least very likely, to arise again in similar factual circumstances; (3) where appellate review could not be obtained before the recurring question would again be moot; and (4) most importantly, the issue was of public importance.” Ott, 413 Mass. at 683, citing Lockhart, 390 Mass. at 783. In the present case, both parties have fully argued the issue of whether the NBME violated Currier’s rights by failing to provide her with additional break time to express breast milk. Indeed, this is evidenced by the parties’ litigation of Currier’s request for injunctive relief, which has been addressed at both the trial and appellate levels, along with their provision to this court of five separate volumes containing summary judgment materials.
Furthermore, the question at issue is very likely to arise again in similar factual circumstances. Individuals seeking to obtain medical licenses in Massachusetts take the USMLE, which includes the Step 2 CK. These individuals include female medical students and graduates, some of whom will invariably be new mothers such as Currier at the time they take the examination. The NBME argues that Currier’s subsequent passing of the *417 Step 2 CK means that the “capable of repetition” standard cannot be satisfied because there is no “reasonable expectation that the same complaining party would be subject to the same action again.” McLaughlin v. Boston Sch. Comm., 952 F.Sup. 33, 35 (D.Mass. 1996), citing Murphy v. Hunt 455 U.S. 478, 482 (1982). In Massachusetts, however, the question does not have to be capable of repetition “with respect only to the same claimant . . . [since] [t]he doctrine is designed to assist in the clarification of law generally, not simply to aid a particular party.” Commonwealth v. Murchison, 428 Mass. 303, 305 (1998). In addition, the issue presented fairly maybe characterized as one which is likely to evade effective review. As with pregnancy, the period that a mother lactates and breastfeeds her child is limited in duration due to the natural physical progression of both the mother and child. If the cessation of breastfeeding by a particular plaintiff makes a case moot, then related litigation “seldom will survive much beyond the trial stage and appellate review will be effectively denied.” Roe v. Wade, 410 U.S. 115, 125 (1973).
Finally, the issue is one of public importance, particularly Currier’s claim that the NBME’s decision to refuse her additional break time to express breast milk constituted discriminatory state action in violation of what Currier contends is her fundamental right to breastfeed. See Dike v. School Bd. of Orange County, Fla., 650 F.2d 783, 787 (5th Cir. 1981), overruled on other grounds, Shahar v. Bowers, 114 F.3d 1097, 1102 (11th Cir. 1997) (holding that the United States Constitution protects from excessive state interference a woman’s decision with respect to breastfeeding her child). Parents have a fundamental right to rear their children; Care and Protection of Charles, 399 Mass. 324, 334 (1987), citing Pierce v. Society of Sisters, 268 U.S. 510, 534-35 (1925); Meyer v. Nebraska, 262 U.S. 390, 399 (1923); and Massachusetts has specifically recognized the importance of mothers to be able to breastfeed their children, such as when they are in public settings. G.L.c. Ill, §221. For these reasons, it is appropriate to address the merits of Currier’s otherwise moot case.
III. Articles 1, 10, and 12 of the Massachusetts Declaration of Rights
Currier alleges that the NBME violated articles 1, 10, and 12 of the Massachusetts Declaration of Rights in refusing to provide her with additional break time during the Step 2 CK to enable her adequately to express breast milk, contending that this is her fundamental right. To succeed on this claim, Currier must show that the NBME engaged in state action. “If a nominally private entity is performing a function that is ‘traditionally the exclusive prerogative of the State,’ then all the acts of that entity are State action.” Phillips v. Youth Dev. Program, Inc., 390 Mass. 652, 654 (1983), quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 353 (1974). The United States Supreme Court has taken a narrow view with respect to what functions are traditionally reserved to the state. Id. at 654-55 (functions having this status are running a company town, elections, and possibly the exercise of eminent domain, while excluded functions include nursing care, education, resolution of private disputes, and providing utility service).
In a comparable case, the First Circuit examined whether Educational Testing Service, Inc. (“ETS”), a nonprofit corporation that prepares and administers the Law School Admission Test (“LSAT j was a state actor for the purposes of a due process claim brought by an exam-taker. Johnson v. Educational Testing Service, 754 F.2d 20 (1985). The plaintiff argued ETS was a state actor because it administered the LSAT, an examination that was a prerequisite to admission to nearly all law schools, and because it had a contract with the Law School Admission Council (“Council”), which contract provided that the Council had responsibility for carrying out law school admission testing programs and determining policy concerning the conduct of the programs. Id. at 23-24.
In rejecting the plaintiffs argument, the court relied on recent Supreme Court cases holding that the actions of private parties, even if compelling a state response, did not constitute state action notwithstanding the fact that these parties received significant government funding. Id. at 24, citing Blum v. Yaretsky, 457 U.S. 991, 1005 (1982); Rendell-Baker v. Kohn, 457 U.S. 830, 840-41 (1982). In its ruling, the Court compared ETS to the National Collegiate Athletic Association (“NCAA”), which the Fourth Circuit had ruled not to be a state actor, even though fully one-half of the nearly one thousand four-year colleges and universities comprising the association were themselves public institutions. Id, at 24, citing Arlosoroff v. National Collegiate Athletic Ass’n, 746 F.2d 1019, 1020 (4th Cir. 1984). Finding the argument advanced by the plaintiff in the case against ETS even less compelling, the Johnson court observed “[wjhereas the NCAA is capable of disqualifying an athlete from intercollegiate competition... ETS merely reports test scores and lacks the authoriiy to decide who shall be admitted and who shall be rejected.” Id. at 25. The court concluded that “the formulation, grading, and reporting of standardized tests is not an exclusive public function” and entered summary judgment against the plaintiffs due process claim. Id.[5]
For the reasons set forth in Johnson, this court likewise concludes that the NBME does not engage in state action. The NBME does not decide which individuals may obtain medical licenses in Massachusetts. Those decisions are instead made by the Board, the actual state entity which maintains control over whether to use, and if so, how to use the Step 2 CK. See 243 Code Mass. Regs. §2.02(2) (“An applicant may fulfill the examination requirements for licensure by submitting evidence of having achieved a score acceptable to the Board on the licensing examinations listed at 243 [Code Mass. Regs.] 2.02(2)(a)” (emphasis added)). See also Brown v. Federation of State Med. Bds. of the United States, 1985 WL 1659, *5 (N.D.Ill. 1985), holding that the NBME’s supplying of testing services did not make it a state actor, *418 and that the true state actors for purposes of the plaintiffs civil rights claims were the state licensing boards). Accord McKeesport Hospital v. The Accreditation Council for Graduate Medical Education, 24 F.3d 519 (3rd Cir. 1997) (that a state Medical Board elected to follow the decision on accreditation of medical residency programs reached by the defendant, an association of private medical organizations, did not serve to “imbue” that association with state authority to render it a state actor).
Moreover, these medical examination requirements comprise only one portion of the Commonwealth’s medical licensure provisions, which also require an individual to have received certain pre-medical education, medical education, and post-graduate medical training, and to submit proof of good moral character that the Board determines to be satisfactory. 243 Code Mass. Regs. §2.02. Adopting the view that the NBME’s interconnection with the state licensing authority renders it a state actor logically, it could be argued, would implicate the inclusion of other non-public entities into that same category, in a manner inconsistent with established case law. See, e.g. Rice v. The President and Fellows of Harvard College, 663 F.2d 336, 337-38 (1st Cir. 1977). See also The Harvard Crimson, Inc. v. The President and Fellows of Harvard College, 445 Mass. 745, 751 (2006), citing with approval the holding of the First Circuit in Rice that the university was not sufficiently enmeshed with the Commonwealth to meet the state action requirement for purposes of a claim brought under §1983.
Contrary to Currier’s contention, the fact that the NBME and the Board both seek to promote and protect the health of the public does not make the NBME an agent of the Board. Likewise, the court rejects Currier’s contention that the NBME engages in state action by virtue of claimed delegation by the Board of the authority to determine whether an examinee has a qualifying disability, and if so, what accommodation will be offered. Any such authority, instead, finds its origin in the ADA, which requires “(a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes [to] offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.” 42 U.S.C. §12189. In sum, the NBME is not performing an exclusive state function in its formulation, grading, and reporting of examinees’ scores on the Step 2 CK. Thus, even viewing breastfeeding as a fundamental right as Currier urges, her claim against NBME on this count still founders due to the lack of state action. The NBME, therefore, is entitled to summary judgment on this claim.
IV. Massachusetts Civil Rights Act, G.L.c. 12, §§11H-1II
Currier also alleges that NBME’s decision not to provide her with additional break time violated the MCRA by coercing her either (1) to take the Step 2 CK without time necessary adequately to breastfeed, in violation of her privacy rights, or (2) not to take the Step 2 CK and be ineligible to receive a medical license and the associated economic benefits of the profession. To establish a claim under the MCRA,[6] a plaintiff “must prove that (1) [her] exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by ‘threats, intimidation or coercion.’ ” Buster v. George W. Moore, Inc., 438 Mass. 635, 644 (2003), quoting Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 564 (1995).
Although the MCRA is “entitled to liberal construction of its terms,. .. the act was not intended to create, nor may it be construed to establish, a vast constitutional tort.” Mancuso v. Massachusetts Interscholastic Athletic Ass’n, Inc., 453 Mass. 116, 131-32 (2009) (internal quotations and citations omitted). Courts use a reasonable person standard to determine whether a defendant’s conduct constituted threats, intimidation, or coercion. Haufler v. Zotos, 446 Mass. 489, 505 (2006). While the MCRA does not define “coercion,” the appellate courts have defined the term as “the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done” or “the active domination of another’s will.” Buster, 438 Mass. at 646, quoting Planned Parenthood League of Mass., Inc v. Blake, 417 Mass. 467, 474 (1994). In limited circumstances, economic coercion, standing alone, may be actionable under the MCRA. Id. at 648.
In the present case, the NBME’s decision not to provide Currier with additional break time cannot be reasonably construed as moral force intended to make Currier forgo the exercise of her right to breastfeed. The NBME did not prohibit Currier from expressing breast milk during the examination, and it even attempted to facilitate the process by offering her personal item exceptions and a private room to help facilitate the process. Furthermore, the NBME’s policy of providing additional time only to examinees with qualifying disabilities who need this accommodation demonstrates the NBME’s legitimate concern for ensuring the integrity of the testing process. See Bally v. Northeastern Univ., 403 Mass. 713, 719 (1989) (“indiscriminate, impartially administered [drug] testing ... is not comparable with the direct assault found in cases where we have granted relief under the [MCRA]”); T&D Video, Inc. v. City of Revere, 66 Mass.App.Ct. 461, 483 (2006) (municipality’s adult entertainment ordinances did not interfere with plaintiffs rights by coercion where the record lacked sufficient evidence of an animus against the plaintiff or its project which was unrelated to the municipality’s legitimate concerns).
While Currier correctly states that the MCRA’s coercion element may be satisfied where the “natural effect” *419 of the defendant’s actions is to coerce the plaintiff in the exercise of her rights, Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 100 (1987), the NBME’s decision here had no such effect. As discussed, the NBME did not morally compel Currier not to express breast milk, but instead allowed Currier to do so at any time during the Step 2 CK and it attempted to facilitate the process. See Brunette v. Lynn Public Schools, 433 Mass. 179, 183 (2001). Accordingly, NBME is entitled to summary judgment on this claim.
V. Massachusetts Equal Rights Act, G.L.c. 93, §102
Currier next alleges that NBME violated the MERA by refusing to provide additional break time for her adequately to express breast milk when taking the Step 2 CK since she did not have the same rights benefitting white male citizens to enforce her contract with the NBME. General Laws c. 93, §102(a) provides in pertinent part, “(a]ll persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts .. .” G.L.c. 93, §102(a). This language draws upon 42 U.S.C. §§1981 and 1982 (2000) as those statutes existed at the time, while expanding the categories of persons covered beyond race. Thurdin v. SEI Boston, LLC, 452 Mass. 436, 440 (2008). An entity violates G.L.c. 93, § 102(a) where it is shown, based on the totality of circumstances, that it denied an individual any of the rights protected by this statute. G.L.c. 93, § 102(c). “Only discrimination that is both purposeful and based on sex, race, color, creed or national origin comes within the reach of the statute; if any element is missing, a claim under the statute fails.” LaCava v. Lucender, 58 Mass.App.Ct. 527, 535-36 (2003), citing Dartmouth Review v. Dartmouth College, 889 F.2d 13, 17 (1st Cir. 1989) (construing 42 U.S.C. §1981 to apply only when the discrimination in question is purposeful).
In the present case, Currier contends that the NBME’s provision of forty-five minutes of standard break time discriminated against women on the basis of their gender by providing insufficient time for those who were breastfeeding at the time the exam was administered. She relies on Massachusetts Elec. Co. v. Massachusetts Comm’n Against Discrimination, 375 Mass. 160, 167-72 (1978), in which the Supreme Judicial Court held that a company’s exclusion of pregnancy-related disabilities from its comprehensive disability plan constituted discrimination in violation of G.L.c. 151B, §4.[7] In such “disparate treatment” cases, where it is alleged that an employer purposefully uses gender as the determinative in an employment decision, “proof of discriminatoiy motive is indispensable.” School Comm. of Braintree v. Massachusetts Comm’n Against Discrimination, 377 Mass. 424, 428-29 (1979); see also King v. City of Boston, 71 Mass.App.Ct. 460, 468 (2008) (holding that a plaintiff must present some evidence showing that a discriminatory animus brought about the adverse employment action). In the present case, there is no evidence that the NBME was providing only forty-five minutes of standard break time purposefully to deny women additional break time alleged to be needed adequately to breastfeed. The situation is qualitatively different than that in Massachusetts Electric Co. in which the conduct found discriminatoiy consisted of expressly identifying a gender-related condition and singling it out for disqualification from an enunciated benefit.
Currier also argues that the NBME’s provision of standard break time, while facially neutral, had a disparate impact on breastfeeding women. In “disparate impact” cases, where “employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another,” discriminatoiy motive is not a required element of proof. School Comm. of Braintree, 377 Mass, at 429. Under the MERA, however, the alleged discrimination by the NBME against breastfeeding women based on their sex must be purposeful, a factor serving to curtail any “disparate impact” analysis as urged by Currier. See LaCava, 58 Mass.App.Ct. at 535-36.
Currier finally argues that the NBME discriminated against her by providing accommodations to examinees whose impairments did not qualify as disabilities. She bases this assertion on her interpretation of documents in the record which indicate that the NBME provided accommodations to particular examinees who had, respectively, the physical impairments of a broken back, a dysfunctional bladder, and acute pain in the lower right backside. Even assuming this fact to be true, however, the NBME’s decision not to provide Currier with additional break time to accommodate her need to express breast milk — undisputedly itself not a disability under governing law — does not amount to discrimination on the basis of sex. The record indicates that the NBME only intended to provide accommodations to examinees whose impairments qualified as disabilities, even non-permanent impairments that it determined on a case-by-case basis had a long-term impact that substantially limited one or more major life activities. See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198-99 (2002) (“That the Act defines ‘disability’ ‘with respect to an individual,’ 42 U.S.C. §12102(2), makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner”). That the NBME arguably may have been over-inclusive in its disability determinations does not subject it to liability where Currier’s condition by the requisite governing definition did not constitute a disability. Since the circumstances do not show that the NBME purposefully discriminated against Currier in refusing to provide her with accommodations, the NBME is also entitled to summary judgment on this claim.
VI. Massachusetts Public Accommodations Act, G.L.c. 272, §§92A, 98
Currier finally alleges that the NBME’s decision not to provide her with additional break time violated the *420 MPAA by discriminating against her on account of sex in a place of public accommodation.[8] General Laws c. 272, §92 defines “a place of public accommodation” as “any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public.” G.L.c. 272, §92A. The NBME argues that it is a corporation operating outside of Massachusetts and therefore not a “place” within the Commonwealth falling within the scope of the statute. See United States Jaycees v. Massachusetts Comm’n Against Discrimination, 391 Mass. 594, 602 (1984), quoting Black’s Law Dictionary 1034 (5th ed. 1979) (“In its primary and most general sense [place] means locality, situation or site and it is also used to designate an occupied situation or building”).
That the exam physically is conducted at the Promet-ric testing center in Brookline, however, would appear sufficient to meet the definition of a place of public accommodation, open to and accepting the patronage of the public who are taking offered examinations, including the Step 2 CK. Nonetheless, even if it qualifies as a place of accommodation under the statute, as discussed with reference to Currier’s other claims, the record contains no evidence that the NBME did discriminate against Currier on the basis of her sex. For that reason, her count based upon this claim also would not succeed.
ORDER
For the forgoing reasons, it is ORDERED that the plaintiff Sophie Currier’s Motion for Summary Judgment be and hereby is DENIED, and the defendant National Board of Medical Examiners’ Motion for Summary Judgment be and hereby is ALLOWED.

 In her Amended Complaint, Currier further seeks a preliminary injunction requiring the NBME to provide her with an additional sixty minutes of break time and a private room with a power outlet on each day she took the examination. As discussed in the background, a single justice on the Appeals Court issued a preliminary injunction that ordered the NBME to provide Currier the relief requested. The NBME complied with this order when Currier did take the examination over the course of two days, October 10 and 11, 2007.

 Under NBME policy, for an individual to be eligible to take the Step 2 CK, that person must be in one of the following categories at the time of application and on the date of the examination: (1) a medical student officially enrolled in, or a graduate of, a US or Canadian medical school program leading to the MD degree that is accredited by the Liaison Committee on Medical Education (“LCME”); a medical student officially enrolled in, or a graduate of, a US medical school leading to the DO degree that is accredited by the American Osteopathic Association (“AOA”); a medical student officially enrolled in, or a graduate of, a medical school outside the United States and Canada and eligible for examination by the Educational Commission for Foreign Medical Graduates (“ECFMG”).

 The parties have not stated explicitly what prompted the re-taking the following year, although the fair inference is that Currier did not attain a passing score on the October 2007 examination.

 As noted by the single justice of the Appeals Court who had ruled on Currier’s application for preliminary injunctive relief, the Fourth Circuit in Johnson had mentioned in a footnote that circumstances might exist in which a testing entity such as ETS could be found to be a state actor. Johnson, 754 F.2d at 25, n. 2. That comment in Johnson references two cases, neither of which, however, lend support to a finding of state action in the present case. See Martin v ETS, 179 N.J. 317, 324 n.7 (Ch.Div. 1981) (no analysis of issue, as ETS conceded status as state actor based upon its role in developing and administering in close cooperation with the state of Pennsylvania a real estate license exam which reflected that state’s particular laws and practices), and Golden Rule Life Ins. Co. v. Mathias, 86 Ill.App.3d 323 (4th Cir. 1980) (court rules inappropriate dismissal of count against ETS for failure properly to plead sufficient allegation relating to state action where ETS’ involvement with state licensure of brokers extended, inter alia, to development of exam pursuant to its own specifications, determination of who passed that exam, and the physical printing of the state licenses).

 General Laws c. 12, §11H provides, “Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured . . .”
General Laws c. 12, §111 provides, “Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shaH be entitled to an award of the costs of the litigation and reasonable attorneys fees in an amount to be fixed by the court.”

 GeneraI Laws c. 15 IB, §4, the Massachusetts employment discriminate statute, provides in pertinent part, “It shaH be an unlawful practice: 1. For an employer, by himself or his agent, because of the race, color, reHgious creed, national origin, sex, sexual orientation, which shaH not include persons whose sexual orientation involves minor children as the sex object, genetic Information, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privHeges of employment, unless based upon a bona fide occupational qualification.”

 General Laws c. 272, §98 provides, “Whoever makes any distinction, discrimination or restriction on account of race, color, religious creed, national origin, sex, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, deafness, blindness or any physical or mental disability or ancestry relative to the admission of any person to, or his treatment in any place of public accommodation, resort or amusement, as defined in section ninety-two A, or whoever aids or incites such distinction, discrimination or restriction, shall be punished by a fine of not more than twenty-five hundred dollars or by imprisonment for not more than one year, or both, and shaH be liable to any person aggrieved thereby for such damages as are enumerated in section five of chapter one hundred and fifty-one B ... A11 persons shaH have the right to the fuU and equal accommodations, advantages, facilities and privileges of any place of public accommodation, resort or amusement subject only to the conditions and limitations established by law and applicable to all persons. This right is recognized and declared to be a civil right.”