Southern Worcester Cty. Reg. Vocational School Dist. *v.* Labor Relations Comm'n.

SOUTHERN WORCESTER COUNTY REGIONAL VOCATIONAL
SCHOOL DISTRICT *vs.* LABOR RELATIONS COMMISSION.

Middlesex. January 3, 1979. — May 3, 1979.

Present: QUIRICO, BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Administrative Law*, Judicial review. *Labor*, Collective bargaining, Unfair labor practice.

In a proceeding before the Labor Relations Commission, a finding that a school committee had violated its duty to bargain in good faith by voting a unilateral wage increase in the absence of an impasse in contract negotiations was supported by substantial evidence. [904]

In a proceeding before the Labor Relations Commission, a finding that a school committee had violated its duty to bargain in good faith by conditioning its contract negotiations on disclosure by the union of the names of its negotiators was supported by substantial evidence. [904]

In a proceeding before the Labor Relations Commission, the commission did not err in finding that a comment by a school superintendent to the president of a teacher's union suggesting that the behavior of teachers at a negotiation session might have an adverse effect on tenure decisions constituted a threat of economic reprisal in violation of G. L. c. 150E, § 10(*a*)(1). [904-905]

In a proceeding before the Labor Relations Commission, the commission did not err in finding that an employer's order to remove inoffensive union literature from employees' mailboxes interfered with the employees' rights in violation of G. L. c. 150E, § 10(*a*)(1). [905]

CIVIL ACTION commenced in the Superior Court on June 4, 1976.

The case was heard by *Meagher*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*David F. Grunebaum* (*Charles Healey, III*, with him) for the defendant.

*Matthew R. McCann (James F. Cosgrove* with him) for the plaintiff.

BRAUCHER, J. This controversy arose out of the breakdown of collective bargaining negotiations between the Southern Worcester County Regional Vocational School District Committee (school committee) on behalf of the plaintiff employer and the Bay Path Vocational Association (union) in 1974. The Labor Relations Commission (commission) found violations of G. L. c. 150E, § 10(*a*)(1) and (5), by the employer and violations of § 10(*b*)(1) and (2) by the union, and issued an order to cease and desist and to take affirmative action. A judge of the Superior Court found that most of the complaints were "trivial" and concerned "childish and immature" action, and modified the commission's decision. We hold that the decision should not have been modified, and direct enforcement of the commission's order.

The union and the employer filed complaints with the commission in November, 1974. The commission issued complaints against both on January 17, 1975. Hearings were held before hearing officers during the period from February to May, 1975, and there was oral argument before the full commission in February, 1976. The commission issued its decision May 6, 1976. The employer sought judicial review in the Superior Court pursuant to G. L. c. 30A, § 14, the union intervened, and both the union and the commission by counterclaim sought enforcement of the commission's order against the employer. Judgment was entered in the Superior Court in November, 1977. The commission appealed, and we allowed a joint application by the commission and the union for direct appellate review. A cross-appeal by the employer was withdrawn.

1. *The commission's findings.* We summarize the findings of the commission. A collective bargaining agreement between the parties expired on August 31, 1974. Negotiators reached agreement on a successor contract on August 13, but the teachers voted on September 6 to

377 Mass. 897                                                      899

Southern Worcester Cty. Reg. Vocational School Dist. *v.* Labor Relations Comm'n.

reject it. At the next meeting, on September 16, the union added to its team a negotiator from the Massachusetts Teachers Association (MTA). His presence was challenged by the school committee, a heated exchange followed, and he left the room to caucus with the thirty to forty teachers assembled in the corridor outside the negotiating room.

Ground rules adopted by the parties in February, 1974, provided that each negotiating team would have a maximum of three members, but that both "have a right to bring in an MTA Representative or School Committee attorney as a fourth man if needed." After the caucus, the MTA negotiator reentered the room with about thirty-five teachers and announced that they had voted to increase the union bargaining team for that one night "to show that they had a definite concern for the School Committee's lack of respect for the ground rules." The school committee representatives refused to negotiate with the group, but, having reviewed the ground rules, offered to resume with the MTA negotiator participating. That offer was not accepted, and the meeting ended. The next morning, commenting on the events, the superintendent-director of the school said to the president of the union: "With some people coming up for tenure this year, that's a pretty stupid thing to do."

By letter dated September 26, the school committee informed the union that it would no longer participate in negotiations for the 1974-1975 contract, stating among other things that union behavior at the September 16 meeting had "made mockery of the entire bargaining endeavor." The union replied by letter, requesting a place on the school committee's agenda for October 7 in order to respond to the September 26 letter, and the union president prepared a response indicating a willingness to resume bargaining. The school committee declined to permit him to speak at the October 7 meeting and, without consulting the union, voted the teachers a $500 across-the-board salary increase.

During the rest of October and November union members attended and picketed four school committee meetings and picketed the places of business of four school committee members. In January, 1975, they picketed the school during a business meeting attended by the chairman of the school committee. The picketing was peaceful, but the chairman adjourned one meeting when the teachers refused to remove picket signs from the meeting room. At another meeting there was a shortage of chairs and an argument whether persons could be required to leave if not seated; the meeting continued after more chairs were brought in. The picketing of places of business was also peaceful, and the pickets did not block entrances or exits. No location was picketed for more than one hour or on more than one occasion. The commission found that the primary purpose of the picketing was to persuade the school committee to return to the bargaining table.

After the first instance of picketing at a place of business, the union president placed in the teachers' mailboxes in the school's administration office copies of a newspaper account of the picketing and notes thanking the teachers for their support. The superintendent-director directed the union president to remove the documents because of their "inflammatory" character. The commission found the union president's message inoffensive.

By letter dated November 19, 1974, the superintendent-director informed the union president that the school committee was willing to start negotiations for the 1975-1976 contract, and asked for the names of the union's bargaining representatives and dates and frequency of proposed meetings. The union submitted dates but did not name the members of its bargaining team. The school committee persisted in requests for names of negotiators, and except for one "informal" conference in January, 1975, no subsequent negotiations took place.

During an "open house" for parents of prospective students on November 20, 1974, at the entrance to the build-

377 Mass. 897                                   901

Southern Worcester Cty. Reg. Vocational School Dist. *v.* Labor Relations Comm'n.

ing three teachers distributed leaflets setting out the union's position. The purpose was to encourage the school committee to resume negotiations. The superintendent-director protested the activity by letter, characterizing it as "insubordination." Later, letters of reprimand were placed in the personnel files of the three teachers.

2. *The commission's decision.* The commission found that the union committed a prohibited practice under G. L. c. 150E, § 10(*b*)(1) and (2), by refusing to bargain in good faith when it violated the ground rules on September 16 and persisted in the violation after the school committee offered to comply with those rules. But that violation, though it may have suspended the employer's duty to bargain, did not excuse its refusal to meet after September 16. Accordingly, the commission found, the employer refused to bargain in good faith and thus committed a prohibited practice under G. L. c. 150E, § 10(*a*)(1) and (5), by that refusal, by granting a unilateral wage increase, and by conditioning negotiations for the 1975-1976 contract on disclosure of the identity of the union's bargaining representatives.

The commission found that the union's alleged disruption of school committee meetings, its picketing, and its distribution of leaflets had the lawful objective of persuading the school committee to resume negotiations. Moreover, those activities were conducted peacefully and produced no material disruption of the operation of the school and no significant economic injury. They were not coercive and were not inconsistent with the union's duty to bargain in good faith, but instead constituted protected concerted activities.

The commission further found that the employer committed practices prohibited by § 10(*a*)(1), by its reprimands to teachers who distributed leaflets, its directive to remove documents from faculty mailboxes, and its implied threat of reprisals against teachers coming up for tenure.

The commission ordered the employer and the union to cease and desist from each prohibited practice. In addition, the employer was ordered to bargain collectively in good faith, upon request, for both a 1974-1975 agreement and a 1975-1976 agreement, to embody in a signed agreement any understanding reached, to remove the reprimands from the personnel files, to post a prescribed notice of the actions to be taken, and to notify the commission within ten days of the steps taken in compliance. The union was also ordered to post a prescribed notice, and to notify the commission.

3. *The Superior Court decision.* The case was heard in the Superior Court on the record, briefs, and oral argument. The judge made "findings of fact" summarizing the events leading to the commission's decision, nine issues presented by the complaints of the parties, and the commission's decision. In addition, he found that, except for two complaints, "the complaints were trivial and complained of childish and immature action on the part of their opponents," that the hostility between the parties was exacerbated by the submission of the complaints and the action of the commission, that the picketing of places of employment and private places of business of school committee members was unauthorized harassment, and that the union engaged in prohibited practices by virtue of its activities at school committee meetings after September 16 and its picketing.

Judgment was entered that the employer and the union should cease and desist from failing or refusing to bargain collectively in good faith for a 1974-1975 agreement, should bargain in good faith for a 1975-1976 agreement, and should embody such agreements in written and signed contracts. The judgment also provided that the reprimands should be removed from the personnel files, and that the employer should post the following notice: "That the members of both the Committee and the Association shall immediately resume negotiations and bargain collectively in good faith, as adults, without baiting and harassing each other."

377 Mass. 897                                    903

Southern Worcester Cty. Reg. Vocational School Dist. *v.* Labor Relations Comm'n.

4. *Scope of review.* The appeal is from the judgment of the Superior Court, but this court is conducting an analysis of the same agency record, and there is no reason why the view of the Superior Court should be given any special weight. *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd., ante* 282, 285 n.4 (1979). Both in the Superior Court and in this court the scope of review is defined by G. L. c. 30A, § 14. *Franklin* v. *Labor Relations Comm'n,* 363 Mass. 878 (1973). That definition does not call upon either court to decide whether complaints are "trivial" or whether the actions complained of were "childish" or "immature." Whatever the effect the commission might give to such characterizations, we may not treat the proceeding as a trial de novo or displace the commission's choice between two conflicting views, even though we might justifiably have made a different choice had the matter been before us in the first instance. *School Comm. of Wellesley* v. *Labor Relations Comm'n,* 376 Mass. 112, 120 (1978). *Labor Relations Comm'n* v. *University Hosp., Inc.,* 359 Mass. 516, 521 (1971).

The Superior Court judgment directs both the employer and the union to bargain in good faith both for a 1974-1975 agreement and for a 1975-1976 agreement, and directs the removal of the reprimands from the personnel files; to that extent it affirms the commission decision. The judge also made "findings" as to disruption of school committee meetings and picketing, but the judgment entered does not implement those "findings." Since the employer has withdrawn its cross-appeal, it is not now entitled to a more favorable judgment. We therefore do not consider further those aspects of the case.

The judgment in effect modifies the commission decision by failing to provide relief for four charges against the employer: the unilateral increase in wages, the demand for the identity of the union negotiators, the threat of economic reprisal, and the prohibition of union use of teachers' mailboxes. We confine our discussion to issues relating to those charges.

5. *Unilateral wage increase.* In the absence of impasse, a unilateral change in wages or terms and conditions of employment may be inconsistent with a duty to bargain in good faith. *NLRB* v. *Katz,* 369 U.S. 736, 743 (1962). *NLRB* v. *Pacific Grinding Wheel Co.,* 572 F.2d 1343, 1349 (9th Cir. 1978). The commission found that on October 7, 1974, the school committee refused to permit the union president to speak and, without prior consultation with the union, voted a unilateral wage increase. It further found that there was no such impasse as would permit the unilateral action, and hence that the action was a violation of the duty to bargain. Those findings were supported by substantial evidence. Even if there was a temporary impasse on September 16, the commission could and did find that any impasse remaining on October 7 was the result of the school committee's unlawful refusal, in its letter of September 26, to meet further with the union. We need not consider the legal effect of the impasse procedure prescribed by G. L. c. 150E, § 9.

6. *Identity of union negotiators.* The commission found that the employer had insisted that the union name its negotiators "so that negotiations for the school year 1975-1976 may begin," and it ordered the employer to cease and desist from "conditioning negotiations for the 1975-1976 contract upon disclosure by the Association of the identity of its bargaining committee." The finding was supported by substantial evidence, and there was no error in the commission's conclusion that there was a violation of the duty to bargain in good faith. The selection of the union negotiating team was an internal union matter, and provided no basis for the employer's refusal to bargain. *General Elec. Co.* v. *NLRB,* 412 F.2d 512, 516-517 (2d Cir. 1969). *Concord Docu-Prep, Inc.,* 207 N.L.R.B. 981, 985 (1973).

7. *Threat of economic reprisal.* Following the September 16 meeting, the superintendent-director made a comment to the union president suggesting that the teachers' behavior might have an adverse effect on tenure deci-

sions. The commission found that the comment was a threat of economic reprisal for supporting the union, and ordered the employer to cease and desist from making such threats. See § 10(*a*)(1). There was no error. A threat need not be explicit if the language used can reasonably be construed as threatening. *NLRB* v. *Ayer Lar Sanitarium,* 436 F.2d 45, 49 (9th Cir. 1970). *Colonial Corp. of America* v. *NLRB,* 427 F.2d 302, 305-306 (6th Cir. 1970). The employer now argues that the comment was limited to the conduct which the commission found to constitute an unlawful refusal of the union to bargain, prohibited by § 10(*b*)(2). But the superintendent-director's remark, however intended, was not so limited by its terms.

8. *Faculty mailboxes.* The employer's order to remove union literature from the teachers' mailboxes was based on the "inflammatory" character of the literature. The commission found that the literature was inoffensive, and that finding was supported by substantial evidence. Thus there was no error of law in the commission's conclusion that the employer's order interfered with the employees' rights in violation of § 10(*a*)(1). See *Friedman* v. *Union Free School Dist. No. 1,* 314 F. Supp. 223, 225-228 (E.D.N.Y. 1970).

9. *Disposition.* The judgment is reversed and the case is remanded to the Superior Court. A judgment is to be entered affirming the decision of the commission and enforcing its order.

*So ordered.*