NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1055

M.N.D. & another[1]

vs.

DEPARTMENT OF CHILDREN AND FAMILIES.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mothers, M.N.D. and E.N.D., appeal from a Superior Court judgment that largely affirmed, under G. L. c. 30A, § 14 (7) (§ 14 [7]), a decision of a Department of Children and Families (DCF) hearing officer.  As relevant here, the hearing officer upheld DCF decisions to (1) support, under G. L. c. 119, § 51B (§ 51B), an allegation that M.N.D. had neglected her child Dan (a pseudonym)[2]; (2) remove two foster children from the

_____

[1] E.N.D.

[2] Although there is some evidence in the record that Dan "sometimes use[s] they/them pronouns," the hearing officer did not expressly determine what pronouns Dan prefers.  We therefore avoid the use of pronouns when referring to Dan.

mothers' home on an emergency basis; and (3) revoke the mothers' foster care license.  We affirm.

We address at the outset the mothers' confusion regarding the nature of our review.  An appellate court reviewing a Superior Court judge's ruling under § 14 (7) "is conducting an analysis of the same agency record, and there is no reason why the view of the Superior Court should be given any special weight.  Both in the Superior Court and in [the appellate] court the scope of review is defined by G. L. c. 30A, § 14" (citation omitted).  Southern Worcester County Regional Vocational Sch. Dist. v. Labor Relations Comm'n, 377 Mass. 897, 903 (1979) (Southern Worcester).  Therefore, the question before us is not whether the judge's characterizations of DCF's record and legal conclusions were incorrect, as the mothers' brief suggests, but instead whether, on our own review of the record, the hearing officer's decision meets the standards of § 14 (7).  We need not and do not address the mothers' arguments aimed solely at the judge's decision.

1.  Substantial evidence.  The mothers contend that the hearing officer's decisions were not supported by substantial evidence.  Specifically, they challenge the decision that upheld the § 51B determination to support allegations of both educational and emotional neglect by M.N.D., as well as DCF's

2

decision revoking the mothers' foster care license.  We conclude

that each decision was supported by substantial evidence.

a.  Governing standards.  The substantial evidence standard

is well settled.  See Cobble v. Commissioner of Dep't of Social

Servs., 430 Mass. 385, 390 (1999).  We need not repeat it here,

other than to acknowledge the mothers' point that our review

must "take into account whatever in the record fairly detracts

from the supporting evidence's weight."  Id.  "[A]n agency's

conclusion will fail judicial scrutiny if the evidence points to

no felt or appreciable probability of the conclusion or points

to an overwhelming probability of the contrary" (quotation and

citation omitted).  Id. at 390-391.  But a court may not

"displace [an agency's] choice between two conflicting views,

even though [the court] might justifiably have made a different

choice had the matter been before [the court] in the first

instance."  Southern Worcester, 377 Mass. at 903.

We must also recognize the particular nature of a decision

under § 51B to "support" a report of abuse or neglect under

G. L. c. 119, § 51A (§ 51A).[3]  At the times of these events, to

---

[3] There is no allegation of abuse here.  "Neglect" is
defined in pertinent part as "failure by a caretaker, either
deliberately or through negligence or inability, to take those
actions necessary to provide a child with minimally adequate
. . . emotional stability and growth, or other essential care."
110 Code Mass. Regs. § 2.00 (2008).

3

support a § 51A report of neglect, DCF did not need to definitively determine that neglect occurred, but only that there was "reasonable cause to believe" that neglect occurred.[4] 110 Code Mass. Regs. § 4.32(2) (2009). See Cobble, 430 Mass. at 394; Kyle K. v. Department of Children & Families, 103 Mass. App. Ct. 452, 453, (2023).

In turn, reasonable cause to believe was defined to mean "a collection of facts, knowledge or observations which tend to support or are consistent with the allegations, and when viewed in light of the surrounding circumstances and credibility of persons providing information, would lead one to conclude that a child has been . . . neglected." 110 Code Mass. Regs. § 4.32(2).[5] Then, as now, the hearing officer evaluating whether there is such reasonable cause to believe must "giv[e] due weight to the clinical judgments of [DCF] social workers." 110 Code Mass. Regs. § 10.05(c) (2014). See 110 Code Mass. Regs. § 10.29(2) (2014). And, at the hearing, the appellant has the

---

[4] Now, DCF also may consider whether there is "substantial risk" of neglect occurring. 110 Code Mass. Regs. § 4.32(2)(a)(1) (2023). Under the updated regulation, "support" requires a determination, in pertinent part, that "[t]he action or inactions by the parent(s) or caregiver(s) place the child(ren) in danger or present substantial risk to the child(ren)'s safety or well-being." Id. at (2)(a)(2).

[5] The current definition is not materially different. See 110 Code Mass. Regs. § 4.32(3) (2023).

4

burden to show, by a preponderance of the evidence, that DCF "has not demonstrated there is reasonable cause to believe that a child was . . . neglected" (emphasis added).  110 Code Mass. Regs. § 10.23(d) (2014).

The reasonable cause standard serves a "threshold function" to identify "known or suspected instances of child abuse and neglect" (emphasis added).  Cobble, supra at 386 n.3, quoting Care & Protection of Robert, 408 Mass. 52, 63 (1990).  The purpose is not to adjudicate whether neglect occurred but only "to determine whether further action is warranted."  Care & Protection of Robert, supra.  See Kyle K., 103 Mass. App. Ct. at 453, 459-460.  Nor is any showing of actual harm required.  B.K. v. Department of Children & Families, 79 Mass. App. Ct. 777, 783 (2011).  "We thus are not being asked whether [M.N.D. actually neglected Dan], something on which we express no opinion. Rather, we must determine only whether there was substantial evidence before the hearing officer supporting the determination that there was 'reasonable cause to believe' [M.N.D. neglected Dan]."  Kyle K., supra at 458.

b.  Educational neglect.  i.  State law standards.  Because Dan was homeschooled, we begin by acknowledging the homeschooling standards provided by Massachusetts law.  A child of school age must attend a public school unless, among other

5

exceptions, the child "is being otherwise instructed in a manner approved in advance by the superintendent or the school committee." G. L. c. 76, § 1. In Care & Protection of Charles, 399 Mass. 324 (1987) (Charles), the court ruled that the overarching standard for approval of a homeschooling plan is the same as that statutorily provided for approval of a private school: the local school committee must be "satisfied that the instruction in all the studies required by law equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town." Id. at 331, quoting G. L. c. 76, § 1. See Care & Protection of Ivan, 48 Mass. App. Ct. 87, 89-91 (1999).

Judges, and we think child welfare officials, may look to these standards for guidance in determining "whether a child is 'without . . . necessary and proper . . . educational care and discipline' and whether the 'parents . . . are unwilling . . . or unavailable to provide any such care, discipline or attention.'" Charles, 399 Mass. at 329, quoting G. L. c. 119, § 24. See Care & Protection of Emily, 58 Mass. App. Ct. 190, 192-193 (2003). "Primary among [the relevant factors] is the

6

proposed curriculum and the number of hours of instruction in each of the proposed subjects."[6]  Charles, supra at 338-339.

ii.  Hearing officer's findings.  We now recount the hearing officer's pertinent findings regarding educational neglect, supplemented where appropriate by references to the underlying evidence.  At the time of the § 51A report, Dan was seven years old, the child of M.N.D. and M.N.D.'s former spouse, K.D., who uses they/them pronouns.  M.N.D. had remarried to E.N.D., who was regarded as Dan's stepmother.  M.N.D. and K.D. shared physical custody of Dan, but M.N.D. was responsible for Dan's education; she communicated with K.D. about Dan's progress.  M.N.D. knew of the Charles decision and had obtained a local school official's approval to homeschool Dan in the 2020-2021 school year.

In August 2021, after Dan's first year of homeschooling, M.N.D. submitted a progress report and letter of intent to continue homeschooling.  An assistant superintendent later told DCF that she found the letter "highly unusual and not age level appropriate."  Had she seen the plan when M.N.D. submitted it,

_____

[6] For example, reading and arithmetic are required subjects, and a minimum of 180 days of schooling is required.  Charles, 399 Mass. at 338-339, citing G. L. c. 71, § 1; 603 Code Mass. Regs. § 27.01 (1980).  See 603 Code Mass. Regs. § 27.03 (2020).

7

she would not have approved it, as it was "extremely concerning."[7]

In October 2021, in response to an e-mail message from E.N.D., Dan's therapist e-mailed the mothers and K.D. to recommend that Dan obtain an individualized education program (IEP) evaluation to address lack of reading skills and attention issues. Two days later, M.N.D. and E.N.D. informed the therapist that they were terminating her services, and they took exception to the therapist's having included K.D. on the e-mail message. K.D. informed M.N.D. that K.D. disagreed with the termination decision and believed an educational evaluation was appropriate. At about this time, the terminated therapist (a mandated reporter) filed a § 51A report alleging educational neglect. The therapist cited concerns about M.N.D.'s failure to provide proof to K.D. that Dan received proper education and lesson planning, and M.N.D.'s termination of Dan's therapy after the therapist recommended an IEP evaluation.

---

[7] The plan and accompanying progress report covered an extraordinarily large number and wide range of topics, some of them quite advanced. Setting aside whether particular topics were age-appropriate -- an issue on which we express no view -- the plan would cause a reasonable person to question whether Dan would do sufficient in-depth work on core subjects and essential skills for a seven year old during the hours devoted to Dan's schooling.

A DCF response worker interviewed K.D., along with M.N.D.'s mother and grandmother; the three of them expressed concerns that M.N.D. was misrepresenting Dan's academic capacity, progress, and achievements. The response worker also interviewed Dan, who was engaging and talkative but struggled to stay focused. Dan "denied knowing the days of the week and months of the year and did not participate in/with the [r]esponse [w]orker's recitation" of them. Notably, M.N.D.'s progress report to the local school system had declared that Dan made "phenomenal academic progress in all subjects," including that Dan had "worked on mastering numbers 0-100." But when the response worker asked Dan how high Dan could count, Dan could not count past twenty-nine. This was consistent with what the worker had learned from K.D.

Dan further told the worker that Dan was "unschooled," meaning Dan was allowed to decide what happened in school each day and what to learn; this included being allowed to "pick 'nothing.'" Dan qualified this by saying Dan "usually picks 'books,'" but Dan was not able to describe what Dan did each day for education. Dan "struggled" to read a book to the worker, stating that Dan "does not like to read." Yet M.N.D.'s report to the school system had stated that Dan had "made significant progress learning to read," had been reading many books

9

"including the Magic Tree House series in its entirety as well as all the accompanying non-fiction books, [and] loves that they can explore the world through books."

The response worker also interviewed M.N.D., who had determined on her own that Dan had attention deficit hyperactivity disorder (ADHD) and autism, although neither had been formally diagnosed. M.N.D. nevertheless denied the need for an educational evaluation and cited her capacity as the educator to appropriately modify Dan's curriculum based on her "two informal diagnoses" of Dan. M.N.D. also obtained a homeschool program evaluation. The evaluator's review relied on information provided by M.N.D., including recordings of Dan reading, to conclude that Dan had a sufficient curriculum, had appropriate growth during the 2020-2021 school year, and was learning to read.

DCF supported the report that M.N.D. had neglected Dan's educational needs, and the hearing officer's decision found "reasonable cause to believe" that such neglect had occurred. Among the principal grounds were that M.N.D. had overstated Dan's competencies in reading and math, that M.N.D.'s curriculum was focused on political issues that were developmentally beyond Dan's understanding, and that M.N.D. had terminated the

10

relationship with the therapist who had recommended an IEP evaluation.

iii. <u>Mothers' claims on appeal</u>. We now address the mothers' various claims that the decision to support the report for educational neglect was itself unsupported by substantial evidence. We are unpersuaded.

The mothers first argue that the record "refutes that [M.N.D.] had terminated services with the therapist because of the proposed IEP." Although the hearing officer did not expressly find such a causal relationship, the record would support a finding that the recommendation for an IEP evaluation at least contributed to M.N.D.'s termination decision. Moreover, M.N.D.'s decision diminished the likelihood that Dan would in fact obtain the recommended evaluation. M.N.D. had assured K.D. via text message that M.N.D. would follow up with the therapist to learn more about that recommendation. Yet, less than an hour later, M.N.D. notified the therapist of the termination decision, without engaging in the promised follow-up.

The mothers also assert that the DCF response worker's interview with Dan was not substantial evidence of Dan's lack of knowledge of the names of days and months and Dan's inability to count past twenty-nine. The mothers now suggest, without

11

citation to authority, that the response worker lacked the "expertise and specialized training" necessary to make these observations. They did not raise this issue at the hearing, however, other than to ask about the response worker's qualifications. She testified that she was a social worker and investigator with twenty-three years of DCF experience, including training in investigations and forensic interviewing. Nor did the mothers argue that expert testimony was needed to establish that seven year old Dan's inability to count past twenty-nine created some cause for concern. See Albert v. Municipal Court of Boston, 388 Mass. 491, 493-494 (1983) (party may not raise arguments on appeal that could have been but were not raised in agency proceeding).

The worker reported her observations of Dan in writing, and at the hearing she testified to many of the same facts. The mothers' counsel did not cross-examine the worker on the accuracy of her observations, other than to elicit that the interview with Dan had occurred late in the day, implying that Dan may have been tired at the time.

Considering all of the above, nothing barred the hearing officer from crediting the worker's statements. "[I]t is for the agency, not the reviewing court, to weigh the credibility of witnesses." Cobble, 430 Mass. at 393 n.8. This is not a case

12

where the testimony at issue was so "indefinite" and "overly speculative" that it "cannot reasonably form the basis of impartial, reasoned judgment." Id.

Next, the mothers criticize as "speculative hearsay" the assistant school superintendent's opinion that M.N.D.'s written 2021-2022 homeschooling plan was "highly unusual and not age level appropriate." The mothers do not dispute, however, that this was the opinion the assistant superintendent expressed, and the hearing officer made no finding as to whether the opinion was valid. For all the record shows, it was considered merely as the view of an educational professional about a document in the record. It could properly be considered as an "observation[] which tend[s] to support or [is] consistent with" the report of educational neglect, "and when viewed in light of the surrounding circumstances and credibility of [the] person[] providing information," could help provide "reasonable cause to believe" that Dan's education had been neglected, 110 Code Mass. Regs. § 4.32(2), the threshold for considering "whether further action is warranted." Care & Protection of Robert, 408 Mass. at 63.

The mothers further complain that the assistant superintendent did not testify at the hearing, but they do not explain why they did not subpoena her, just as the transcript

13

shows they subpoenaed K.D. There was evidence that M.N.D. had discussed the plan with the assistant superintendent, who had told M.N.D. that the plan was "very unusual" and, inferably, not age appropriate. Yet M.N.D., in her hearing testimony, did not address the assistant superintendent's opinion or their discussion about the plan. In light of all the above, we see no error or abuse of discretion in the hearing officer's consideration of the opinion.

Continuing, the mothers attack K.D.'s statements of concern about Dan's education. They claim the statements were self-serving and contradicted by other evidence, including that K.D. had some responsibility for education, had expressed support for M.N.D.'s original homeschooling plan more than a year before the events at issue here, and had previously told M.N.D. that K.D. was proud of something Dan had written. But none of that evidence contradicts K.D.'s statements from around the time the § 51A report was filed that K.D. was concerned about Dan's education and favored the IEP evaluation that M.N.D. apparently opposed. And the hearing officer expressly declined to credit the mothers' claims that K.D.'s statements were untrustworthy.

Nor was the hearing officer bound to credit the homeschool program evaluation obtained by M.N.D., after the § 51A report was filed, concluding that Dan was making acceptable educational

14

progress. That evaluation may "detract[] from the . . . weight" of the evidence of educational neglect, but it does not show there is "no felt or appreciable probability" of educational neglect or that there is "an overwhelming probability of the contrary" (citation omitted). Cobble, 430 Mass. at 390-391. Rather, this is a case where we "may not . . . displace the [hearing officer's] choice between two conflicting views." Southern Worcester. 377 Mass. at 903.

c. Emotional neglect. In communicating with the therapist and others during the § 51B investigation of educational neglect, DCF became concerned about how M.N.D.'s conduct affected Dan's emotional well-being. DCF ultimately supported the allegation of neglect for the additional reason that M.N.D. had failed to provide minimally adequate emotional stability for Dan. Among the principal grounds were that M.N.D. had terminated Dan's relationship with the therapist, inferably at least in part because the therapist had recommended an IEP evaluation, and despite the therapist's and K.D.'s views that Dan was progressing; that M.N.D.'s mental health issues, including her "need for control, unstable relationships, and the ability to distort information and be untruthful," were negatively affecting Dan; and that the mothers were pushing Dan to adopt gender expressions that made Dan uncomfortable.

15

We now address the mothers' claims that the hearing officer's decision to support the report for emotional neglect was itself unsupported by substantial evidence. As with the decision regarding educational neglect, many of the mothers' arguments reflect, at best, their disagreement with how the hearing officer chose to resolve two fairly conflicting views of the evidence. We therefore address, for illustrative purposes, only three of the mothers' arguments. Those that we do not address suffer from similar flaws.

First, the mothers argue that Dan's participation in therapy until just prior to the § 51A report shows that M.N.D. provided Dan with emotional stability. But the therapist stated that M.N.D. was inconsistent in bringing Dan to therapy, doing so only three times in five months, in contrast to K.D., who brought Dan regularly. The therapist viewed M.N.D.'s inconsistency as slowing Dan's progress. In a similar vein, the mothers claim that M.N.D. "encouraged" K.D. to continue bringing Dan to therapy, but the record shows that M.N.D. told the therapist that Dan's continuing with the therapist was "against [her] wishes," and the therapist informed M.N.D. that unless M.N.D. as well as K.D. (i.e., both parents) supported Dan's being in therapy, the therapist could not ethically continue treating Dan.

16

Second, the mothers assert that DCF's concern about emotional stability arose from unfounded and uncorroborated allegations, by K.D. and M.N.D.'s estranged family, about M.N.D.'s own mental health. But the record includes extensive and detailed accounts by K.D. and M.N.D.'s mother and grandmother about M.N.D.'s history of erratic, manipulative, and emotionally abusive behavior. Although, as noted above, the mothers claimed that K.D.'s statements were untrustworthy, the hearing officer rejected that claim. Dan's therapist was also concerned about M.N.D.'s mental health and about potential manipulation and emotional abuse in the home. That the mothers disagreed with these assessments did not require the hearing officer to credit the mothers' version of events.

Third, the mothers insist that they were not forcing gender identity issues onto Dan but merely reacting to issues Dan raised. Dan had told the DCF response worker that the mothers were "trying to convince me to be a girl, but I have a penis, I am freaking out and don't know what to do." Although Dan referred to Dan's use of they/them pronouns as a matter "decided with [M.N.D.]," Dan simultaneously said that "[M.N.D.] makes all the decisions for me, like I am part of her," and that M.N.D. makes Dan feel that "I can't think for myself." Dan's therapist, who had training in gender identity issues, had seen

17

"zero evidence" that Dan had any such issues and believed that "many thoughts and statements" were coming from the mothers rather than Dan. K.D., who identified as a person with gender identity issues, expressed similar views. To be sure, the mothers denied that they "placed any gender identity issue on" Dan. But the hearing officer was not required to credit that denial.

In sum, even after considering the evidence that detracts from the hearing officer's decision that there was reasonable cause to believe emotional neglect was occurring, we conclude that there was substantial evidence to support that decision.

d. <u>Foster care license revocation</u>. The hearing officer upheld the revocation of the mothers' foster care license on at least two grounds.[8] First, the mothers exceeded the bounds of their roles by promising the two foster children, soon after their placement in the home, that the mothers would adopt them, as well as their younger sibling. This was contrary to a basic tenet of the mothers' written agreement with DCF: that foster care is a "temporary arrangement which envisions the eventual

---

[8] These same two grounds were the basis for DCF's emergency removal of the foster children from the home, which we discuss <u>infra</u>. It is not immediately clear whether DCF or the hearing officer also relied on the decision to support the § 51A report as a ground for revoking the foster care license. We need not resolve the point, as we would uphold the revocation decision in either event.

18

reunification" of children with their birth families, which goal foster and preadoptive parents are responsible for supporting. 110 Code Mass. Regs. § 7.111 (2009). Second, during the § 51B investigation, DCF learned of "concerning omission[s] of information" by the mothers during DCF's earlier study of their suitability for licensing. This included information about M.N.D.'s mental health history that "would likely have precluded approval of the [mothers'] foster care license" if DCF had known of it during the licensing study.

The mothers' limited arguments directed at the hearing officer's decision also are unpersuasive.

The mothers suggest that because the evidence showed DCF had learned of E.N.D.'s mental health history during the licensing study and yet had issued the license, M.N.D.'s mental health history likewise would not have precluded licensure had it been timely disclosed. What this overlooks is that M.N.D.'s history was both more concerning than E.N.D.'s and had not been timely disclosed to DCF. Contrary to the mothers' assertions, that history and the conduct associated with it could reasonably be, and "in the judgment of [DCF]" was, determined to "impair [M.N.D.'s] ability to assume and carry out the responsibilities of a foster/pre-adoptive parent." 110 Code Mass. Regs. § 7.104(2) (2009).

19

That M.N.D. may have signed releases for her medical records during the licensing study does not demonstrate that she disclosed her mental health history to DCF. She points to nothing in any medical records made available to DCF that details that mental health history, nor does she challenge the accuracy of what DCF learned about her history during the § 51B investigation. Further, that other DCF social workers had commented favorably on M.N.D.'s performance as a foster parent before the investigation did not preclude DCF from developing serious concerns based on information learned during the investigation. Finally, that M.N.D.'s own therapist testified to having no concerns about M.N.D.'s mental health as a parent did not require DCF or the hearing officer to reach the same conclusion. In sum, even considering what the mothers point to as detracting from the hearing officer's decision, there was substantial evidence to support the revocation of the foster care license.

2. Examination of K.D. The mothers argue that the hearing officer abused her discretion and violated their due process rights by "terminating the cross-examination of" K.D., thereby "den[ying] [the mothers] the opportunity to develop a complete record." This is simply false. The hearing transcript shows that the mothers' counsel called K.D. as a witness and conducted

direct examination of K.D. at some length.  Counsel sought to question K.D. about statements made by or attributed to K.D. in certain documents, or that the mothers believed were contradicted by other documents.  When a dispute arose about the relevance of some of those questions, the hearing officer asked if there was "a way for us to streamline questioning."  After some discussion, counsel stated, "I can present those documents as evidence to rebut what's in [K.D.'s] testimony and stop [K.D.'s] testimony at this point in time."  The hearing officer accepted this suggestion, and counsel voiced no reservation. Having agreed to forego further examination of K.D., the mothers cannot now reverse course and claim that the hearing officer abused her discretion or violated their due process rights.

3.  Procedural violations.  The mothers argue that the hearing officer abused her discretion in concluding that various procedural violations by DCF did not prejudice the mothers' substantial rights.  See G. L. c. 30A, § 14 (7) (reviewing court may grant relief "if it determines that the substantial rights of any party may have been prejudiced" by agency error).  We are not persuaded.

First, the mothers challenge the hearing officer's conclusion that it was harmless error for DCF to delay notifying them of the § 51A report until ten days after it was filed.

21

They argue that this lapse of time "delayed them from securing appropriate counsel" in a related Probate and Family Court proceeding wherein K.D. filed a complaint for modification to obtain custody of Dan. Assuming for the sake of argument that prejudice in a separate, nonagency proceeding could constitute prejudice under § 14 (7), the problem nevertheless remains that the mothers cite nothing in the record to support their claim of prejudice. We take judicial notice that an attorney representing the mothers filed a notice of appearance in the Probate and Family Court proceeding on November 10, 2021, fourteen days after K.D. filed the modification complaint. See Jarosz v. Palmer, 436 Mass. 526, 530 (2002) (court may take judicial notice of court records in related case). The mothers do not explain why that attorney was not "appropriate counsel" or how his inability to appear earlier caused them any prejudice. We recognize that, on the day K.D. filed the modification complaint, K.D. also obtained an ex parte custody order, but the mothers do not explain, nor do we see, how they could have prevented that result had they been given earlier notice of the § 51A report.

Second, the mothers' brief asserts in a single sentence that "because of DCF's procedural violations, DCF did not have the opportunity to meet with [Dan] while in [M.N.D.'s] care or

22

see them interacting."  We understand this as an assertion that, had DCF given them notice of the § 51A report before K.D. obtained an ex parte custody order, DCF could have observed Dan interacting with M.N.D., and that this would have put M.N.D. in a better position in the § 51B investigation.  Assuming for the sake of argument that this claim was made to the hearing officer (which the record does not show), the mothers point to nothing in the record suggesting that DCF would otherwise have engaged in such observation of parent-child interactions here, or that DCF ordinarily did so during a § 51B investigation.[9]  Thus the mothers have shown no prejudice from the delay in notification.

4. <u>Mootness of removal issue</u>.  The mothers next argue that the judge erred in ruling that their challenge to DCF's decision to remove the foster children from their home was moot.  The ruling was correct.  We are upholding the revocation of the mothers' foster care license, without which they cannot lawfully provide such care.[10]  "[L]itigation is considered moot when the

_____

[9] Under regulations then in effect, a § 51B investigation "shall include a viewing of the child who is the subject of the report."  110 Code Mass. Regs. § 4.27(1) (2009).  Nothing in that regulation suggested that the purpose of such viewing was to observe parent-child interactions, rather than to ascertain the child's safety.  The mothers' brief does not discuss the regulation or its purpose.

[10] It is at least strongly implicit in the extensive licensing provisions of 110 Code Mass. Regs. §§ 7.100 - 7.114

23

party who claimed to be aggrieved ceases to have a personal stake in its outcome, [such as] where a court can order no further effective relief" (quotations and citations omitted). Lynn v. Murrell, 489 Mass. 579, 582 (2022).  Even if we concluded that DCF's removal of the foster children from the mothers' home was contrary to law, we could not order DCF to place the foster children back in the mothers' care, now that the mothers are unlicensed.  Because effective relief is unavailable, their challenge to the removal decision is moot.

The mothers suggest that their challenge is "of public importance, capable of repetition, yet evading review" (citation omitted).  Seney v. Morhy, 467 Mass. 58, 61 (2014).  But they identify no specific issue raised by this case that meets those criteria.  Whether this particular removal decision was unsupported by substantial evidence or infected by other error is a factual question that, while understandably important to the mothers, is neither of public importance nor likely to recur.  The mothers also suggest that the removal decision casts a stigma on them, giving them a continuing interest in the case and saving it from mootness.  But any such stigma is subsumed within whatever stigma results from the revocation of their

_____

(2009), that an unlicensed person may not provide foster care for a child in DCF custody.  See G. L. c. 119, §§ 22-23, 23C.

24

foster care license, which we are upholding in any event.  The mothers do not explain how reversing the removal decision, while leaving the license revocation decision undisturbed, would save them from any meaningful increment of stigma.

Finally, even if the removal decision were not moot, the mothers have shown no error in it.  The relevant section of their brief merely cites the judge's conclusion that DCF failed to observe "certain procedural safeguards" before removing the foster children.  The judge, in turn, cited DCF regulations requiring that, in many circumstances, removal cannot be based on a § 51A report unless and until the report is supported under § 51B.  See 110 Code Mass. Regs. § 7.116 (2009) (§ 7.116).  But the removal notice in the record here informed the mothers that this was an "[e]mergency removal during 51B investigation." Section 7.116 does not purport to govern such emergency removals; its sole reference to emergencies occurs in a subpart governing removals for reasons other than a threat of neglect of a foster child.  110 Code Mass. Regs. § 7.116(2)(a).  The hearing officer apparently cited § 7.116 only to demonstrate that DCF has discretion to remove foster children from a home where their well-being is endangered.[11]

---

[11] To whatever extent the hearing officer relied on § 7.116 as providing affirmative authority for emergency removals, that reliance appears to be harmless error.

25

As legal authority for the removal, the hearing officer cited DCF's Family Resource Policy #2006-01, at 29 (rev. May 18, 2021). That policy authorizes "[e]mergency removal of a child who is in [DCF] care or custody from the care of a foster/pre-adoptive family," but "only when [DCF] has determined that the child is not safe in her/his current setting and is at immediate risk." Id. The child's supervisor and the area program manager must approve the emergency approval. Id. The hearing officer found that DCF's "clinical managers and [a]rea [d]irector met to discuss the information obtained [in the § 51B investigation] and utilized clinical expertise to conclude [that the foster children's] emotional well-being was endangered by leaving them in the foster home." The record states that this decision was made at a "[t]eam meeting with all DCF parties." We see nothing in the hearing transcript or elsewhere in the record to suggest that the mothers contested whether the area program manager gave

26

approval.  Accordingly, that is not a reason to overturn the removal decision.

> Judgment affirmed.
>
> By the Court (Desmond,
>     Sacks & Brennan, JJ.[12]),
>
> Clerk

Entered: May 23, 2025.

---

[12] The panelists are listed in order of seniority.